UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HDT BIO CORP., | CASE NO. C22-0334JLR |
| Plaintiff, | ORDER DENYING MOTION TO STAY DISCOVERY |
| v. | |
| EMCURE PHARMACEUTICALS, LTD., | |
| Defendant. | |

## I.    INTRODUCTION

Before the court is Defendant Emcure Pharmaceuticals, Ltd.'s ("Emcure") motion

to stay discovery pending the outcome of its motion to dismiss.  (Mot. (Dkt. # 25); Reply

(Dkt. # 34); *see also* MTD (Dkt. # 23).)  Plaintiff HDT Bio Corp. ("HDT") opposes the

motion.  (Resp. (Dkt. # 29).)  The court held oral argument on Emcure's motion to stay

discovery on June 8, 2022.  (*See* 6/8/22 Min. Entry (Dkt. # 36).)  The court has

considered the parties' submissions, the arguments of counsel, the relevant portions of the

1    record, and the applicable law.  Being fully advised, the court DENIES Emcure's motion

2    to stay discovery.

3                                    **II.    BACKGROUND**

4            This case arises from the alleged "theft of trade secrets" owned by HDT, a

5    Seattle-based biotechnology company, by Emcure, "one of India's largest manufacturers

6    and distributors of generic drugs."  (*See* Compl. (Dkt. # 1) ¶¶ 1-2, 5.)  As alleged, this

7    saga began when Dr. Sanjay Singh—the chief executive officer ("CEO") of an Emcure

8    subsidiary, Gennova Biopharmaceuticals Ltd. ("Gennova"), and, according to HDT, an

9    Emcure Director—"visited HDT's headquarters in Seattle in January 2020."  (*See id.*

10   ¶ 10.)  Dr. Singh met with HDT CEO, Dr. Steven Reed—a longtime colleague—and

11   "proposed a partnership to bring HDT's then-incipient COVID-19 vaccine to market in

12   India."  (*Id.*)  This proposed arrangement was subsequently formalized through an

13   Exclusive License Agreement ("License Agreement") between Gennova and HDT.  (*Id.*)

14   Pursuant to the terms of the License Agreement, Gennova received "a limited license to

15   use HDT's technology," consisting of its COVID-19 vaccine and delivery platform, "to

16   develop and sell a COVID-19 vaccine in India."  (*Id.* ¶¶ 6, 11.)  In return, "HDT would

17   receive payments and royalties along with an unrestricted license to use Gennova's data

18   to develop and sell the vaccine everywhere else."  (*Id.* ¶ 11.)

19           HDT then began "furnishing Gennova with" proprietary information and essential

20   materials, troubleshooting issues with sourcing raw materials, and providing ongoing

21   technical support that allowed Gennova to quickly obtain regulatory approval to begin

22   clinical trials.  (*See id.* ¶¶ 65-69.)  To facilitate this collaboration, "HDT and Gennova

1  communicated by multiple means, including email and text message, but also weekly or

2  biweekly Zoom teleconferences attended by participants in both Seattle and India." (*Id.*

3  ¶ 69; *see also* Khandhar Decl. (Dkt. # 32) ¶ 5, Ex. B (attaching Zoom invitation showing

4  that the meetings were hosted on Emcure's account).)  HDT was also able to secure

5  funding through the National Institute of Health ("NIH"), which "helped HDT fund

6  Gennova's" vaccine development efforts.  (*See* Compl. ¶ 69.)  Credit for early successes

7  were shared between the parties:  "Emcure and Gennova consistently credited HDT as (at

8  a minimum) the developer of their vaccine and characterized the vaccine as based on"

9  HDT's proprietary technology.  (*See id.* ¶ 70.)  HDT's contributions were even

10  recognized through the name Gennova assigned to its vaccine, "HGC019," where the "H"

11  stood for "HDT."  (*Id.*)

12       Trouble soon began, however.  Emcure and Gennova began delaying or "refusing

13  to share clinical data  on the vaccine's safety and efficacy with HDT," an effort for which

14  HDT suspects Emcure was to blame.  (*See id.* ¶¶ 13, 77.)  Indeed, "Gennova personnel

15  repeatedly told Dr. Reed and HDT personnel that 'their hands were tied' by Emcure

16  regarding various important decisions, including the release of clinical data to HDT."

17  (*Id.*)  By the summer of 2021, "Emcure and Gennova began to take aggressive steps to

18  steal HDT's intellectual property and to claim it as their own," including by

19  "clandestinely fil[ing] two Indian patent applications that claim HDT's inventions."  (*Id.*

20  ¶¶ 78-79.)  Emcure also filed a prospectus "in preparation for" its initial public offering

21  of Emcure stock, in which it touted its successful development of an mRNA COVID-19

22  vaccine without mention of HDT.  (*Id.* ¶ 83.)  "The final nail in the coffin," as HDT puts

1   it, came when Dr. Singh visited Seattle in November 2021 to inform Dr. Reed of Emcure

2   and Gennova's intention to sell their vaccine "free and clear of HDT's intellectual

3   property rights." (*Id.* ¶ 85.)  As soon as Dr. Singh delivered this news, Emcure's CEO

4   called Dr. Singh to speak with Dr. Reed in, according to HDT, a self-serving move born

5   of his "concern[] that a dispute with HDT could jeopardize Emcure's public offering."

6   (*Id.*¶ 85.)  A short while later, "Gennova terminated the License Agreement," a move

7   HDT suspects Emcure ordered.  (*See id.*)

8         HDT now sues Gennova's parent company, Emcure, alleging that it

9   misappropriated HDT's trade secrets in violation of the Defense of Trade Secrets Act, 18

10  U.S.C. § 1836, and Washington Uniform Trade Secrets Act, RCW §§ 19.108.010 *et seq.*

11  (*See* Compl. ¶¶ 94-110.)  On May 13, 2020, Emcure moved to dismiss the case, arguing

12  that the court lacks personal jurisdiction over it; HDT has failed to state a claim; and that

13  dismissal is warranted under the doctrine of forum *non conveniens*.  (*See generally*

14  MTD.)  A week later, on May 20, 2022, Emcure filed the instant motion, through which

15  it asked the court to stay discovery pending disposition of its motion to dismiss.  (*See*

16  *generally* Mot.)  The court denied Emcure's stay motion on the record at the June 8, 2022

17  hearing and indicated that this written order would follow.  (*See* 6/8/22 Min. Entry.)

18                              **III.   ANALYSIS**

19        "A pending motion to dismiss is generally not grounds for staying discovery."  *See*

20  *Edmonds v. Amazon.com, Inc.*, No. C19-1613JLR, 2020 WL 8996835, at *1 (W.D.

21  Wash. Mar. 6, 2020).  In deciding whether to impose a stay pending disposition of a

22  motion, courts consider (1) whether the pending motion would dispose of the entire case,

1   and (2) "whether the pending motion can be decided without additional discovery." *See*

2   *Roberts v. Khounphixay*, No. C18-0746MJP-BAT, 2018 WL 5013780, at *1 (W.D.

3   Wash. Oct. 16, 2018) (citing *Ministerio Roca Solida v. U.S. Dep't of Fish & Wildlife*, 288

4   F.R.D. 500, 503 (D. Nev. 2013)).  "In applying this test, courts take a preliminary peek at

5   the merits of the dispositive motion to assess whether a stay is warranted." *Id.*; *see also*

6   *Zeiger v. Hotel Cal. by the Sea LLC*, No. C21-1702TL-SKV, 2022 WL 1499670, at *2

7   (W.D. Wash. May 12, 2022).  "The 'preliminary peek,' however, is not intended to

8   prejudge the outcome of the motion."  *See id.*

9           Although Emcure seeks dismissal based on the court's lack of personal

10   jurisdiction, HDT's failure to state a claim, and the doctrine of *forum non conveniens* (*see*

11   MTD), it focuses on its personal jurisdiction and forum *non conveniens* arguments in its

12   stay motion (*see* Mot. at 2 (arguing that the court "should stay merits discovery until it

13   has resolved" the "threshold jurisdictional issues" of personal jurisdiction and forum *non*

14   *conveniens* raised therein).  Accordingly, the court has confined its "preliminary peek" to

15   the personal jurisdiction and forum *non conveniens* issues.

16   **A.     Personal Jurisdiction**

17           "Where a defendant moves to dismiss a complaint for lack of personal jurisdiction,

18   the plaintiff bears the burden of demonstrating that jurisdiction is appropriate."

19   *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).  Where

20   the defendants' "motion is based on written materials rather than an evidentiary hearing,

21   'the plaintiff need only make a prima facie showing of jurisdictional facts.'"  *Id.* (quoting

22   *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)).  In assessing whether a prima

1    facie showing of jurisdiction has been made, "[t]he court may consider evidence

2    presented in affidavits" but may also "order discovery on the jurisdictional issues." *Doe*

3    *v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). The plaintiff cannot simply rest on

4    the bare allegations of the complaint, but the court must accept any uncontroverted

5    allegations in the complaint as true and resolve any disputes raised through conflicting

6    affidavits in the plaintiff's favor. *Schwarzenegger*, 374 F.3d at 800; *Boschetto*, 539 F.3d

7    at 1015.

8        The court's personal jurisdiction analysis begins with Washington's "long-arm"

9    statute, *see Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d

10   1114, 1123 (9th Cir. 2002), which "'extends jurisdiction over a defendant to the fullest

11   extent' due process permits," *Puget Sound Surgical Ctr., P.S. v. Aetna Life Ins. Co.*, No.

12   C17-1190JLR, 2018 WL 1172992, at *3 (W.D. Wash. Mar. 6, 2018) (first citing *Wash.*

13   *Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012); and then citing

14   *Shute v. Carnival Cruise Lines*, 783 P.2d 78, 82 (Wash. 1989)). "Thus, the court's

15   jurisdictional analysis collapses into a determination of whether the exercise of personal

16   jurisdiction comports with due process," *id.*, which requires that the court exercise

17   personal jurisdiction only over a defendant who has "take[n] some act by which [it]

18   purposefully avails itself of the privilege of conducting activities within the forum State,"

19   *see Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, — U.S. —, 141 S. Ct. 1017, 1024

20   (2021) (quotation marks omitted).[1]

21

22        [1] HDT does not appear to allege that Emcure has "substantial" or "continuous and
     systematic" contacts with Washington, as is required to establish general jurisdiction over

ORDER - 6

1    In a tort case, "a defendant has sufficient minimum contacts with the forum state

2 to establish specific personal jurisdiction if:  (1) the defendant purposefully directs

3 activities toward the forum state, (2) the plaintiff's claim arises out of or relates to those

4 activities, and (3) an exercise of jurisdiction would be reasonable." *Burri L. PA v. Skurla*,

5 --- F.4th ---, 2022 WL 1815827, at \*4 (9th Cir. 2022) (first citing *Dole Food Co. v. Watts*,

6 303 F.3d 1104, 1111 (9th Cir. 2002); and then citing *Mavrix Photo, Inc. v. Brand Techs.,*

7 *Inc.*, 647 F.3d 1218, 1227-28 (9th Cir. 2011)).

8    At the June 8, 2022 hearing, counsel for Emcure conceded that HDT's

9 uncontroverted allegations and record evidence would likely permit the court to exercise

10 jurisdiction over its subsidiary, Gennova, based on its contact with HDT in Seattle

11 through its CEO, Dr. Singh.  Counsel for Emcure further acknowledged that a factual

12 dispute exists regarding Dr. Singh's relationship with Emcure, including whether he was

13 an Emcure Director during the relevant period, and, accordingly, the extent to which his

14 contacts with HDT are fairly attributable to Emcure.  As the court noted on the record,

15 this factual dispute must be resolved in favor of HDT at this early phase.  *See*

16 *Schwarzenegger*, 374 F.3d at 800.  Resolved in that manner, the court cannot say—after

17 taking only a "preliminary peek"—that Emcure's personal jurisdiction arguments will

18 prevail and that its motion will, accordingly, dispose of this case.  *See Zeiger*, 2022 WL

19 1499670, at \*2.  The court emphasizes, however, the preliminary nature of this

20 //

---

21 Emcure.  *See Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir.
2000); (*see generally* Compl.).  Accordingly, the court considers only whether it would have
22 specific personal jurisdiction over Emcure.

1    conclusion, which is necessarily reached without the benefit of complete briefing on

2    Emcure's motion to dismiss or the more complete record that will likely exist once that

3    motion has ripened.  *See id.* (noting that the court's "preliminary peek" does not betray

4    any prejudgment of the dispositive motion).

5    **B.    Forum *Non Conveniens***

6          "A party moving to dismiss based on forum *non conveniens* bears the burden of

7    showing (1) that there is an adequate alternative forum, and (2) that the balance of private

8    and public interest factors favors dismissal."  *See Dole Food Co.*, 303 F.3d at 1118.  An

9    adequate alternative forum exists "when defendants are amenable to service of process in

10   the foreign forum" and that forum "provides the plaintiff with a sufficient remedy for his

11   wrong."  *Id.*  The relevant private interests include "ease of access to sources of proof;

12   availability of compulsory process for attendance of unwilling witnesses, and cost of

13   obtaining attendance of willing witnesses; and likelihood of a fair trial."  *Id.* at 1119.  The

14   relevant public interest factors include "court congestion, local interest in resolving the

15   controversy, and preference for having a forum apply a law with which it is familiar."  *Id.*

16         As the court indicated at the hearing, based on the record before it, it has serious

17   concerns about the extent to which HDT could obtain relief in India on its tort-based

18   misappropriation of trade secrets claims.  (*See, e.g.*, Berkowitz Decl. (Dkt. # 30) ¶ 10, Ex.

19   F at 55[2] (attaching a report issued by the United States Trade Representative ("USTR"),

20   which observes that companies "continue to face uncertainty due to insufficient legal

21   //

22         [2] The court cites to Exhibit F's internal pagination.

1    means to protect trade secrets in India").[3]  Moreover, because HDT has selected its

2    home forum, Emcure bears a "heavy burden" of showing that litigating in this court

3    "results in oppressiveness and vexation . . . out of all proportion to the plaintiff's

4    convenience." *Cooper v. Tokyo Elec. Power Co., Inc.*, 860 F.3d 1193, 1210-11 (9th Cir.

5    2017) (quotation marks omitted) (quoting *Carijano v. Occidental Petroleum Corp.*, 643

6    F.3d 1216 (9th Cir. 2011)).  The court is not convinced on its "preliminary peek," *Zeiger*,

7    2022 WL 1499670, at *2, that the private and public interest factors—which appear

8    cross-cutting—tip the balance so heavily in that direction, *see Carijano*, 643 F.3d at 1227

9    ("[T]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum,

10   which may be overcome only when the private and public interest factors clearly point

11   towards trial in the alternative forum."  (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S.

12   235, 255 (1981)).

13                        **IV.    CONCLUSION**

14          For the foregoing reasons, as well as those given on the record during the June 8,

15   2022 hearing, Emcure's motion to stay discovery (Dkt. # 25) is DENIED.

16   //

17   //

18          [3] The court takes judicial notice of the USTR report attached to Ms. Berkowitz's
19   declaration.  *See United States v. 14.02 Acres of Land More or Less in Fresno Cnty.*, 547 F.3d
     943, 955 (9th Cir. 2008) (noting that district courts may take judicial notice of reports issued by
     federal agencies when considering a motion made under Federal Rule of Civil Procedure 12); *see*
20   *also EduMoz, LLC v. Republic of Mozambique*, 968 F. Supp. 2d 1041, 1048-49 (C.D. Cal. 2013)
     (taking judicial notice of a federal agency report "concerning corruption in Mozambique" and
21   collecting examples of courts in the Ninth Circuit taking judicial notice of similar reports
     published by federal agencies on conditions in foreign countries), *aff'd*, 686 F. App'x 486 (9th
22   Cir. 2017).

1    Dated this 10th day of June, 2022.

2

3    _____

4    JAMES L. ROBART
     United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22